# IN THE COURT OF APPEALS OF IOWA

No. 14-2052
Filed March 23, 2016

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**BRYAN LEE ROCHE,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.

Bryan Roche appeals his judgment and sentence for first-degree kidnapping, first-degree sexual abuse, attempted murder, and willful injury. **AFFIRMED.**

Mark C. Meyer, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Sheryl A. Soich, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**VAITHESWARAN, Presiding Judge.**

Bryan Roche appeals his judgment and sentence for first-degree kidnapping, first-degree sexual abuse, attempted murder, and willful injury. He contends (1) the evidence was insufficient to support the jury's finding of guilt on the kidnapping charge; (2) the district court should have suppressed his statements to law enforcement officers on the ground they were involuntary; and (3) the jury instructions on sexual abuse reduced the State's burden of proof.

## I. *Sufficiency of the Evidence – Kidnapping*

The jury was instructed the State would have to prove the following elements of first-degree kidnapping:

> 1. On or about the 21st day of April, 2013, the defendant confined [S.P.].
> 2. The defendant did so with the specific intent to subject [S.P.] to sexual abuse.
> 3. The defendant knew he did not have the consent of [S.P.] to do so.
> 4. As a result of the confinement, [S.P.] was intentionally subjected to sexual abuse.

Roche focuses on the evidence supporting the confinement element. This element requires "more than the confinement or removal that is an inherent incident of commission of the crime of sexual abuse." *State v. Robinson*, 859 N.W.2d 464, 475 (Iowa 2015). The element may be satisfied if the confinement "substantially increases the risk of harm to the victim, significantly lessens the risk of detection, or significantly facilitates escape following the consummation of the offense." *Id.* Roche contends this standard was not satisfied. A reasonable juror could have found otherwise.

A juror could have found that S.P. and Roche met online and became friends.  According to S.P., Roche "showed up unannounced" one Sunday.  S.P. told him she was cleaning, but he could come in.  As she picked "stuff off" the floor, Roche grabbed her around the neck and "pull[ed] tighter and tighter" until she passed out.  When she began regaining consciousness, she heard her three-year-old daughter screaming and realized Roche "was starting to tie [her] up" with "red tape."  Roche removed S.P.'s sock, shoved it into S.P.'s mouth, and taped her mouth.  Then he "started cutting" her "clothes off."  When S.P. was naked, Roche raped her, vaginally and anally.

By this time, the sock had fallen out of S.P.'s mouth and she "started to scream."  Roche told her if she did not quiet down, he would hurt her child.  Roche picked S.P. up and took her to her bedroom.  He "threw [her] on the bed" and raped her one more time.  Then he "picked [her] up again" and took her into the hallway, where he raped her a fourth time.  He told her he would continue doing it "until the fun was over."

Next, S.P. watched as Roche got a knife from his coat and stabbed her in her neck.  S.P. "broke free" and attempted to tamp down the bleeding.  Roche stabbed her again in the abdomen.  S.P. managed to retreat to her bedroom, where she braced the door shut with her back.  Roche, who stood outside the door, told her he "only came over to rape [her], but it got out of hand."  He said if she died, he would not go to jail.

Roche remained outside the bedroom door for "[a]bout two hours."  At that point, he told her "he wanted to leave and" her "blood was starting to smell pretty bad."  He demanded "the tape back because . . . it was evidence."  S.P.

extricated herself from the remaining tape, cracked the bedroom door open, and threw the tape out. She heard the apartment door slam. Eventually, S.P. went into the living room and discovered her cell phone "was gone." She sought help from a neighbor, who called the police.

A reasonable juror could have found from these facts that Roche's confinement of S.P. was more than incidental to the sexual abuse. Roche used a knife, "substantially increas[ing] the risk of harm to S.P." *Id.* He taped her mouth, threatened to harm her child when she screamed, transferred her to the bedroom, and removed her cell phone, "significantly lessen[ing] the risk of detection." *Id.* And he waited for her to die and insisted on retrieving evidence of the crime, "significantly facilitate[ing] escape following the consummation of the offense." *Id.* These facts amount to substantial evidence in support of the jury's finding of guilt. *See id.* at 467; *see also State v. Ronnau*, No. 14-0787, 2016 WL 351314, at *5 (Iowa Ct. App. Jan. 27, 2016) (affirming conviction where defendant strangled woman until she passed out, transported her to the other side of the street near a bush, attempted to rip out her tongue when she tried screaming, and threatened to kill her); *State v. Norem*, No. 14-1524, 2016 WL 146237, at *5-6 (Iowa Ct. App. Jan. 13, 2016) (affirming conviction where defendant beat his wife, forced her into a car, drove her home, beat her again, and forced her to perform multiple sex acts); *State v. Schildberg*, No. 14-1581, 2015 WL 4642503, at *1-2 (Iowa Ct. App. Aug. 5, 2015) (affirming conviction where defendant pulled his girlfriend out of bed by her hair, broke one of her ribs, choked her with his legs around her neck, forced her to have sex, made her go

with him to a gas station so she would not escape, kept her phone and purse away from her, and did not allow her to leave the residence when they returned).

## II.    Suppression Ruling – Involuntary Statements

Roche moved to suppress videotaped statements he made to law enforcement officers on the ground they were obtained involuntarily.  Following a hearing, the district court denied the motion.  At trial, the State admitted some of Roche's statements.

On appeal, Roche argues (1) the statements were involuntary, and (2) the statements were the product of promissory leniency.  Preliminarily, we will address an error preservation question relating to the promissory leniency claim.

Roche did not raise promissory leniency in the district court.  *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("[I]ssues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").  He attempts to circumvent this obstacle by suggesting the district court decided the issue notwithstanding his failure to raise it.

It is true the court mentioned promissory leniency.  But the court's reference arose in a different context.  The court was asked to decide whether the statements were voluntary under a constitutional totality-of-the-circumstances test.  *See State v. Madsen*, 813 N.W.2d 714, 722 (Iowa 2012).  In its analysis under this test, the court noted the absence of promises of leniency.  Significantly, the court neither invoked nor applied the evidentiary test used to determine whether law enforcement officers made promises of leniency to extract a confession.  *See State v. McCoy*, 692 N.W.2d 6, 28-29 (Iowa 2005).  Absent application of this evidentiary test, error was not preserved on the promissory

leniency claim.  *See Madsen*, 813 N.W.2d at 723 ("The motion to suppress cited constitutional authority and did not cite *McCoy* or otherwise develop the evidentiary standard, nor did the district court address the evidentiary test . . . . The evidentiary standard was not preserved for direct appeal.").  Accordingly, we decline to address the promissory leniency claim and proceed to the voluntariness issue.

"Under a constitutional totality-of-the-circumstances voluntariness analysis, statements are voluntary if the defendant's will is not overborne or [the] capacity for self-determination is not critically impaired."  *Id.* at 722.  In this context, the Iowa Supreme Court has stated "[a] number of factors help in determining voluntariness," including (1) the defendant's age; (2) whether the defendant had prior experience in the criminal justice system; (3) whether the defendant was under the influence of drugs; (4) whether *Miranda* warnings were given; (5) whether the defendant was mentally "subnormal"; (6) whether deception was used; (7) whether defendant showed an ability to understand the questions and respond; (8) the length of time the defendant was detained and interrogated; (9) the defendant's physical and emotional reaction to interrogation; and (10) whether physical punishment, including deprivation of food and sleep, was used.  *See State v. Payton*, 481 N.W.2d 325, 328-29 (Iowa 1992); *accord Madsen*, 813 N.W.2d at 722-23.

Roche argues he was only twenty-one years old, "had no prior involvement with the criminal justice system," was deceived by police before he arrived at the police station, and had his "will overborne by unrelenting interrogation."

Roche's age is not in dispute. As the district court noted, he was an adult at the time of questioning. *Cf. In re Thompson*, 241 N.W.2d 2, 7 (Iowa 1976) (noting Thompson "was only seventeen" at the time of questioning). According to one of the officers, Roche seemed "very intelligent and very alert" and seemed "calm" and "relaxed." Roche told the officer he did not use drugs or alcohol. The officer characterized him as "perfectly sober." *Cf. State v. Cullison*, 227 N.W.2d 121, 125 (Iowa 1975) (noting defendant "had a history of drug use").

Roche did not have an adult criminal record. However, Roche disclosed some contact with police as a juvenile.

Roche was administered *Miranda*[1] warnings and signed a waiver of his rights. At first blush, this factor would seem to establish the voluntariness of Roche's statements. However, Roche contends the effect of the warnings was diluted by the manner in which he was apprehended. Specifically, officers came to his house and told him he was not in custody, even though an officer was posted at the back door to prevent him from leaving.

We agree the officers were less than candid when they insisted Roche was not in custody at his home, during transport to the police station, and even after he was placed in a locked room at the police station. *See Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (noting "the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of [an] illegal arrest"); *McCoy*, 692 N.W.2d at 23 (noting the State had burden to

---

[1] "In *Miranda* the Supreme Court mandated that during custodial interrogation, an accused be advised of certain constitutional rights." *State v. Davis*, 446 N.W.2d 785, 788 (Iowa 1989) (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966)).

prove the defendant went to the station voluntarily and the facts established "the police illegally seized the defendant in violation of the Fourth and Fourteenth Amendment"). But Roche makes no argument that their lack of candor rendered the initial detention an illegal seizure under the Fourth Amendment to the United States Constitution. Nor does he contend his consent to be questioned at the police station, first voiced in his apartment, was involuntary. Under these circumstances, we are persuaded Roche's waiver of his *Miranda* rights was voluntary.

We turn to whether the circumstances of Roche's interrogation overbore his will, as he contends. Officers placed Roche in a six-foot-by-six-foot room. The door automatically locked and required a key to exit. The room was wired for video and sound recording, and the interview was recorded.[2] As the district court noted, Roche spent several hours in this room but the interrogation was intermittent. Roche was left alone for lengthy periods of time.

Admittedly, the interrogation was intense; the officers confronted Roche with childhood traumas and facts of the case gleaned from other sources, called him a liar, and exhorted him to tell the truth. But the video does not "depict a man whose will was overborne or whose capacity for self-determination was impaired." *Madsen*, 813 N.W.2d at 723. To the contrary, Roche fairly calmly confessed and directed officers to a dumpster where he had discarded evidence. We conclude the confession was voluntary.

---

[2] The recording was made with non-standard software which was cumbersome to download and utilize. The video portion of the recording is clear. The audio portion is not. The jury was given a transcript of the audio as a demonstrative exhibit only, for the limited purposes of assisting the jury in viewing the video. We have examined the transcript but have not verified its accuracy against the recording.

### III.     Jury Instructions on Sexual Abuse

The marshalling instruction for first-degree sexual abuse stated:

> 1. On the 21st day of April, 2013, the defendant performed a sex act with [S.P.].
> 2. The defendant performed the sex act by force or against the will of [S.P.].
> 3. During the commission of sexual abuse, the defendant caused [S.P.] a serious injury.

Roche objected to the following instruction explicating the third element on the ground that the instruction reduced the State's burden of proof:

> With regard to element number 3 of Instruction No. 26, the serious injury need not occur simultaneously with the commission of the sexual abuse in order to constitute first-degree sexual abuse. It is sufficient if the serious injury precedes or follows the sexual abuse as long as the injury and sexual abuse occur as part of an unbroken chain of events or as part of one continuous series of acts connected with one another.

He contends, the jury instruction "confused the *legislative* standard for what is necessary to convict with a judicial standard for what is merely *sufficient* to convict, and this error diminished the State's burden of proof." We disagree.

In *State v. Carter*, 602 N.W.2d 818, 821-22 (Iowa 1999), the Iowa Supreme Court addressed the legislative definition of first-degree sexual abuse and, specifically, the provision requiring the commission of a serious injury "in the course of" committing sexual abuse. *See* Iowa Code § 702.9 (2013). The court stated:

> We hold that under Iowa Code section 709.2 the serious injury need not occur simultaneously with the commission of the sexual abuse in order to constitute first-degree sexual abuse under Iowa Code section 709.2. It is sufficient if the serious injury precedes or follows the sexual abuse as long as the injury and sexual abuse occur as part of an unbroken chain of events or as part of one continuous series of acts connected with one another.

*Carter*, 602 N.W.2d at 822.

The instruction in this case mirrors the court's holding in *Carter*.[3]  Although the holding arose in the context of a sufficiency-of-the-evidence challenge, this procedural context makes it no less valid as an interpretation of the pertinent statute.  We conclude the district court did not err in instructing the jury pursuant to this holding.

We affirm Roche's judgment and sentence.

**AFFIRMED.**

---

[3] In *Carter*, the district court used Iowa's Uniform Criminal Jury Instruction 900.1.  602 N.W.2d at 821 n.2.  The district court used the same instruction here.