# IN THE COURT OF APPEALS OF IOWA

No. 21-1024
Filed November 2, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DATRON ARMONDO SIMMONS, Sr.,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Polk County, David M. Porter, Judge.


    Datron Simmons appeals his conviction for second-degree murder.
**AFFIRMED.**


    Gary Dickey and Jamie L. Hunter of Dickey, Campbell, & Sahag Law Firm,
P.L.C., Des Moines, for appellant.

    Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney
General, for appellee.


    Heard by Vaitheswaran, P.J., Ahlers, J., and Danilson, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2022).

**VAITHESWARAN, Presiding Judge.**

The State charged Datron Simmons with first-degree murder in connection with the death of his wife, Connie. A jury found him guilty of the lesser-included offense of second-degree murder. On appeal, Simmons challenges (I) the sufficiency of the evidence supporting the jury's finding of guilt; (II) the denial of his objection to the State's exercise of a peremptory strike of a potential juror; (III) the admission of hearsay evidence; and (IV) the admission of evidence concerning a prior conviction for domestic abuse assault.

## I.    *Sufficiency of the Evidence*

The jury was instructed that "[m]urder in the [s]econd [d]egree does not require a specific intent to kill another person." Instead, the State had to prove the following elements of second-degree murder:

> 1. On or about September 6, 2020, the defendant did an act that caused the death of Connie Simmons;
> 2. The defendant acted with malice aforethought.

Malice aforethought was defined as "a fixed purpose or design to do some physical harm to another which exists before the act is committed." The jury was instructed "[m]alice aforethought need not exist for any particular length of time."

Simmons argues "[t]here is insufficient evidence to conclude that [he] acted with malice aforethought." The jury could have found otherwise based on the following facts.

Datron and Connie Simmons were married, had an eight-year-old child, and lived together in Des Moines, Iowa. According to a relative, their relationship was "[t]oxic," with "bickering back and forth."

Connie's sister went to the Simmons house one Sunday morning. While there, she spoke to Connie. After leaving, she texted Connie and received a response. Later that day, she received no responses to her texts. Connie's sister never heard from Connie again.

Seven days later, another relative spoke to the Simmons' child and also spoke to Simmons for close to an hour. Simmons told the relative that Connie left the previous Sunday without her car and she had not been back since. Several of his remarks gave the relative pause. She contacted other family members, who called the police.

Police and relatives proceeded to the Simmons home to check on Connie's welfare. Simmons told one of the relatives he did not know where Connie was.

The relatives later returned to find Simmons and his car gone. One of them searched the property, including a burn barrel in the yard. The relative "grabbed a stick" and "dug around in" the barrel. He then looked under a tarp in the yard where he discovered the torso of a dismembered body. From a tattoo, he identified the torso as Connie's. Other portions of the body, including Connie's head and neck, were never found.

Another relative called Simmons, who said he would turn himself in. He did not.

Police attempted to locate Simmons at certain homes. When those searches proved unsuccessful, they "began to . . . conduct a . . . ping of his cell phone," which led them "to the south along the bypass getting on the freeway." A state trooper pulled Simmons over on Interstate 35 South, and officers transported him to the Des Moines Police Department.

Police interviewed Simmons.[1]  A detective testified Simmons initially offered "multiple explanations" for Connie's absence.  He eventually admitted to an argument with Connie.  He claimed he "black[ed] out, and after some time," came "back to, at which point" Connie was "lying in the hallway naked."  According to the detective, Simmons "proceeded to wrap her up in a sheet" and "pulled her out of the house, behind the house, behind the shed, and that's the last thing that he claimed to have known about what had happened to her."

A neighbor testified to seeing a fire in the burn barrel for "[t]hree days and three nights."  She said "[i]t smelled bad."

The Polk County medical examiner determined "[t]here was a violent act that brought about [Connie's] death, but we cannot be positive on what that act was."  His determination was impeded by the post-death dismemberment of Connie's body.

The jury reasonably could have found a "fixed purpose or design to do some physical harm."  Substantial evidence supports a finding of malice aforethought. *See State v. Kinsel*, 545 N.W.2d 885, 888 (Iowa Ct. App. 1996) (setting forth standard of review).

## II.    Batson Challenge

"Purposeful racial discrimination in selection of [a jury] venire violates a defendant's right to equal protection."  *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  "[T]he State's privilege to strike individual jurors through peremptory challenges, is

---

[1] Although the interview was videorecorded, Simmons' responses to questions are barely audible, limiting its evidentiary value.  *Cf. State v. Wedelstedt*, 265 N.W.2d 626, 627 (Iowa 1978) (precluding a party from relying on tape recordings that "were at parts inaudible").

subject to the commands of the Equal Protection Clause," which "forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the . . . jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96; *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019) (citing the Court's abandonment of a prior requirement to show the prosecutor's use of race over a number of cases and underscoring the "basic equal protection point: In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many"). As part of the prima facie case, the defendant must show membership in "a cognizable racial group" and the prosecutor's exercise of "peremptory challenges to remove from the venire members of the defendant's race." *Batson*, 476 U.S. at 96. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging . . . jurors" of the same race. *Id.* at 97. "A neutral explanation . . . means an explanation based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.*

Simmons contends the prosecutor violated *Batson* by exercising a peremptory strike on "a biracial juror [who] did not identify his race in the jury questionnaire." The State responds that Simmons "did not satisfy the first step of the *Batson* test" because "[t]here was no pattern of strikes against jurors of a

particular race." In any event, the State asserts, the prosecutor "offere[ed] race-neutral justifications" for the strike.

Defense counsel identified Simmons as "African-American." The district court stated "[t]hree of the forty-two" jurors in the jury pool "identif[ied] as African-American." The challenged juror was not one of the three. Per defense counsel's representation, that juror checked "other" on the race box of the juror questionnaire. The State exercised one peremptory strike on a person who identified as African American. Simmons does not pursue a *Batson* challenge with respect to the strike of that juror. On our de novo review of the record, we conclude Simmons failed to make out a prima facie case of discrimination by virtue of the State's exercise of a peremptory strike on the juror whose race was identified as "other."

The district court also was persuaded that the prosecutor "provided a race-neutral explanation as to why she chose to strike" the juror. The court cited the prosecutor's reference to the juror's "social media page" and the juror's statements on that page suggesting "suicidal ideations, apparently" and "lack of meaningful relationships." We afford "a great deal of deference to the district court's evaluation of credibility when determining the true motives of the attorney when making strikes." *State v. Veal*, 930 N.W.2d 319, 327 (Iowa 2019) (quoting *State v. Mootz*, 808 N.W.2d 207, 214 (Iowa 2012)). In the absence of evidence that the stated reasons were pretextual, we agree with the district court's ruling. *See Hernandez*, 500 U.S. at 364, 369 (affording "great deference" to the district court's refusal to find the proffered reasons pretextual and stating "[t]he trial court took a permissible

view of the evidence in crediting the prosecutor's explanation"). We conclude the court appropriately denied Simmons' *Batson* challenge.

### III. *Hearsay*

Simmons appeals the admission of several statements "concerning the timing of [Connie's] death" on the ground that they constituted hearsay evidence. "Hearsay" is defined as "a statement that (1) [t]he declarant does not make while testifying at the current trial or hearing; and (2) [a] party offers into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(c). Our review of hearsay claims is for correction of errors at law. *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021).

As noted at the outset, Simmons had an eight-year-old child, who spoke to one of the relatives. The prosecutor asked the relative to recount the conversation. The defense objected on the ground that the statements would constitute hearsay. The district court overruled the objection, and the relative relayed the child's statement that "his mother wasn't home, [and] that he hadn't seen his mother in" several days.

Simmons characterizes these statements as "quintessential hearsay." The State counters that the statements "were offered to explain the family's responsive conduct of insisting on a welfare check, not to prove the truth of when Connie disappeared."

We agree with Simmons that the child's statements fit the definition of hearsay. The statements were offered to prove the truth of the matter asserted—how long the child's mother had been missing. *See State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011) (concluding a detective's narrative of an interview was

hearsay where "[t]he State offered the testimony regarding the detective's initial interview . . . to put the substance of . . . the interview into evidence").

The admission of hearsay evidence over a proper objection is presumed to be prejudicial unless the contrary is established. *See id.* The State "may potentially overcome the presumption of harm . . . by showing that the wrongly admitted evidence was cumulative," although "erroneously admitted hearsay can be prejudicial even when it is cumulative." *State v. Skahill*, 966 N.W.2d 1, 16 (Iowa 2021) (citing *Elliott*, 806 N.W.2d at 669–70).

The child's statements about the length of his mother's absence were cumulative of Simmons' own statements to the relative, as well as the testimony of Connie's sister, who did not hear from Connie for several days. There was scant evidence that would have called the trustworthiness of those statements into question. *Cf. Elliott*, 806 N.W.2d at 670 (noting the witnesses who corroborated the hearsay evidence "initially lied to police" and later "changed their stories"). For that reason, we conclude the admission of the child's statements amounted to harmless error.

Simmons next argues Connie's text messages with him amounted to hearsay evidence. He concedes, "the portions of the text messages authored by [him] are admissible as statements by a party opponent." *See* Iowa R.

Evid. 5.801(d)(2)(A). But he asserts Connie's portion of the exchange was inadmissible.

The State preliminarily raises an error preservation concern. We elect to bypass that concern and proceed to the substantive contention. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999).

The State defends the admission of Connie's messages on the ground that they provided context for Simmons' statements. The supreme court has admitted statements for that reason. *See State v. Hilleshiem*, 305 N.W.2d 710, 712 (Iowa 1981). In *Hilleshiem*, the court concluded the statements served "as circumstantial evidence of the relationship between the defendant and [a woman]" and provided "the context for defendant's admission that he hit [the woman] with his hand." *Id.*[2] While Simmons suggests the statements are still hearsay, similar statements were admitted "without reference to the truth or falsity of the matter asserted." *Id.* In light of *Hilleshiem*, we conclude Connie's texts were not offered for the truth of the matter asserted and, accordingly, did not amount to hearsay. But, even if the evidence was inadmissible hearsay, admission of the texts was harmless error in light of other evidence about the couple's "toxic" relationship. We affirm the district court's admission of the text messages.

## IV.    *Prior Conviction*

The State filed a pretrial motion to determine the admissibility of Simmons' prior conviction for domestic abuse causing injury against Connie. Simmons

---

[2] Simmons concedes "the texts are relevant to explain [the couple's] relationship at the time."

resisted the motion. The district court ruled the conviction was "permissible 5.404(b) evidence."

Iowa Rule of Evidence 5.404(b) governs the admissibility of prior bad acts evidence. *See State v. Thoren*, 970 N.W.2d 611, 625 (Iowa 2022). The rule states:

> (1) Prohibited use. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) Permitted uses. This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Iowa R. Evid. 5.404(b).

Simmons argues the court "fail[ed] to follow the proper procedure for deciding the admissibility of other crimes, wrongs, or acts evidence" and "compounded its error by failing to weigh the probative value of the conviction evidence against the danger of unfair prejudice to [Simmons]." The State counters that a litany of supreme court opinions have "approv[ed] the admission of prior acts of domestic violence" and the conviction "was highly probative of his state of mind during their final encounter."

The law on this score is indeed well-established. "[T]he defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations." *State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004). "The most obvious example of the legitimate use of prior-bad-acts evidence is the admission of evidence of a defendant's prior assaults of a victim in a prosecution of the

defendant for the subsequent murder of the victim." *Id.* Based on that law, we are persuaded the evidence of Simmons' prior conviction was highly probative of Simmons' relationship with Connie.[3]

That probative value, however, has to be balanced against any unfair prejudice. *Id.* at 129. In evaluating the potential prejudice to Simmons, we note that testimony about the conviction was brief. The prosecutor simply elicited the fact and date of the conviction and Simmons' admission "to causing pain or injury by assaulting his wife on that occasion." *See State v. White*, 668 N.W.2d 850, 855 (Iowa 2003) ("[T]he State spent little time developing the prior acts evidence."). While the prior crime was a serious one, the limited facts heard by the jury were unlikely to "have incited overmastering hostility toward" Simmons, particularly when compared with the facts underlying the present case. *See State v. Reyes*, 744 N.W.2d 95, 100 (Iowa 2008) (internal citation and quotation marks omitted); *White*, 668 N.W.at 855 (noting "the prior acts were substantially less brutal than" the acts underlying the present crime). We conclude the district court did not abuse its discretion in admitting evidence of the prior conviction. *See State v. Richards*, 809 N.W.2d 80, 89 (Iowa 2012) (setting forth standard of review).

We affirm the jury's finding of guilt and Simmons' judgment and sentence for second-degree murder.

**AFFIRMED.**

---

[3] Simmons does not contest the requirement of "clear proof." *See State v. Rodriquez*, 636 N.W.2d 234, 243 (Iowa 2001).